2001 WY 94

**Kerry GARNETT, Appellant (Plaintiff),**

v.

**John COYLE, D.O., Appellee (Defendant).**

**No. 00–319.**

Supreme Court of Wyoming.

Oct. 11, 2001.

---

Kerry Garnett, Pro Se, Representing Appellant.

Kathleen B. Dixon of Murane & Bostwick, LLC, Casper, WY, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, and VOIGT, JJ., and PARK, D.J.

VOIGT, Justice.

[¶ 1] This is an appeal from a summary judgment granted to the appellee, Dr. John Coyle (Dr. Coyle). The district court found that the appellant, Kerry Garnett (Garnett), had (1) failed properly to plead the allegations necessary to sustain a 42 U.S.C. § 1983 action; (2) failed to establish a *prima facie* case to sustain a violation of his civil rights under the Eighth Amendment; and (3) failed to set forth *prima facie* evidence to sustain a medical malpractice claim.

[¶ 2] Finding no error in the district court's determination that there are no genuine issues of material fact and that Dr. Coyle is entitled to judgment as a matter of law, we affirm.

## STANDARD OF REVIEW

[¶ 3] Summary judgment motions are determined under the following language from W.R.C.P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

[¶ 4] The purpose of summary judgment is to dispose of suits before trial that present no genuine issue of material

fact. *Moore v. Kiljander*, 604 P.2d 204, 207 (Wyo.1979). Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue of material fact is present. *Weaver v. Blue Cross–Blue Shield of Wyoming*, 609 P.2d 984, 986 (Wyo.1980). A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Schuler v. Community First Nat. Bank*, 999 P.2d 1303, 1304 (Wyo.2000). The summary judgment movant has the initial burden of establishing by admissible evidence a *prima facie* case; once this is accomplished, the burden shifts and the opposing party must present specific facts showing that there is a genuine issue of material fact. *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987); *Gennings v. First Nat. Bank of Thermopolis*, 654 P.2d 154, 156 (Wyo.1982).

[¶ 5] This Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. *Unicorn Drilling, Inc. v. Heart Mountain Irr. Dist.*, 3 P.3d 857, 860 (Wyo.2000) (*quoting Gray v. Norwest Bank Wyoming, N.A.*, 984 P.2d 1088, 1091 (Wyo.1999)). The record is reviewed, however, from the vantage point most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Garcia v. Lawson*, 928 P.2d 1164, 1166 (Wyo. 1996). Mere inferences, conclusions, and assertions are not sufficient to defeat summary judgment. *McClellan v. Britain*, 826 P.2d 245, 247 (Wyo.1992); *Mayflower Restaurant Co. v. Griego*, 741 P.2d 1106, 1113 (Wyo.1987) (*quoting Stundon v. Sterling*, 736 P.2d 317, 318 (Wyo.1987)); *Blackmore v. Davis Oil Co.*, 671 P.2d 334, 336–37 (Wyo.1983) (*quoting Gennings*, 654 P.2d at 155).

[¶ 6] Summary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. *Woodard v. Cook Ford Sales, Inc.*, 927 P.2d 1168, 1169 (Wyo.1996). This is particularly true in malpractice suits. *DeHerrera v. Memorial Hospital of Carbon County*, 590 P.2d 1342, 1345 (Wyo.1979) (*quoting Holl v. Talcott*, 191 So.2d 40, 46 (Fla.1966)). We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact. *See Krier v. Safeway Stores 46, Inc.*, 943 P.2d 405 (Wyo.1997) (failure to establish duty); *Popejoy v. Steinle*, 820 P.2d 545 (Wyo. 1991) (failure of proof of underlying claim of a joint venture); *MacKrell v. Bell H2S Safety*, 795 P.2d 776 (Wyo.1990) (failure of proof of defendant's duty); *DeWald v. State*, 719 P.2d 643 (Wyo.1986) (cause element was pure speculation); and *Fiedler v. Steger*, 713 P.2d 773 (Wyo.1986) (failure to establish cause in a medical malpractice action).

## DISCUSSION

[¶ 7] Garnett is a long-term prisoner in the Wyoming State Penitentiary (WSP). Dr. Coyle provides medical care at WSP through Correctional Medical Services, Inc. (CMS). Garnett's allegations in this case are (1) cruel and unusual punishment resulting from Dr. Coyle's "repeated and intentional acts of deliberate indifference" to Garnett's "serious medical needs;" and (2) the endangerment of Garnett's health and safety through Dr. Coyle's "intentional and deliberate acts of malpractice." At issue is Dr. Coyle's treatment of Garnett for carpal tunnel syndrome (CTS).

[¶ 8] The salient facts of the case must be gleaned from the materials filed in support of, and in opposition to, the motion for summary judgment. Dr. Coyle filed the following relevant items:

1. Affidavit of John Coyle, D.O.
2. CV of John Coyle, D.O.[1]
3. Wyoming State Penitentiary Inmate Medical Records, Kerry Garnett
4. Correctional Medical Services Formulary—Analgesics
5. Affidavit of Brenda Powers, RN
6. Affidavit of Paul Ruttle, M.D.
7. CV of Paul Ruttle, M.D.

1. A "CV" is a resume; "CV" stands for curriculum vitae.

8. Supplemental Affidavit of John Coyle, D.O.

9. Supplemental Affidavit of Paul Ruttle, M.D.

10. Rebuttal Affidavit of Paul Ruttle, M.D.

*In response, Garnett filed the following items:*

1. Nerve Conduction Study
2. Health Services Request Form
3. Infirmary Admission Record
4. Consultation Reports
5. Physician's Orders
6. Progress Notes
7. Dictated Notes of Dr. Schulze
8. Discharge Summary
9. Operative Report
10. Discharge Instructions
11. Lay In
12. Medication Administration Report, September 1999
13. NCCHC (National Commission on Correctional Health Care) Standards "P–01—Access to Care"
14. NCCHC Standards "P–15—Environmental Health and Safety"
15. NCCHC Standards "P–38—Sick Call"
16. NCCHC Standards "P–42—Patient Transport"
17. NCCHC Standards "P–52—Infirmary Care"
18. Wyoming Department of Corrections Medical Care Contract
19. Informal Grievance dated June 23, 1999
20. Formal Grievance dated June 28, 1999
21. Formal Grievance Acknowledgment dated June 29, 1999
22. Formal Grievance Amendment dated July 14, 1999
23. Formal Grievance Appeal dated August 1, 1999
24. Informal Grievance dated August 8, 1999
25. Formal Grievance dated August 11, 1999

26. Formal Grievance Acknowledgment dated August 12, 1999
27. Informal Grievance dated August 17, 1999
28. Informal Grievance Answer dated August 18, 1999
29. Formal Grievance dated August 22, 1999
30. Formal Grievance Answer dated September 3, 1999
31. Grievance Appeal Answer dated September 8, 1999
32. Informal Grievance dated September 8, 1999
33. Letter to Associate Warden Jerry Steele dated September 9, 1999
34. Letter to Associate Warden Jerry Steele dated September 10, 1999
35. Formal Grievance dated September 13, 1999
36. Formal Grievance Acknowledgment dated September 17, 1999
37. Informal Grievance Answer dated September 17, 1999
38. Grievance Appeal dated October 18, 1999
39. Affidavit of Kerry Garnett
40. Affidavit of Merrill Ayers
41. Affidavit of Merrill Ayers
42. Affidavit of Mark Farnham
43. Affidavit of Todd Brock
44. Letter from Lori Gorseth—Attorney General's Office
45. Letter from Dr. Kenneth Schulze
46. Documented refusal to attend dangerous surgical procedure

[¶ 9] Garnett began suffering from left arm and wrist pain as early as 1996. Dr. Coyle began working at WSP in April 1999. In that same month, Dr. Coyle examined Garnett and referred him to Dr. Schulze, an orthopedic surgeon in Rawlins, for evaluation for possible CTS. Dr. Schulze recommended nerve conduction studies, which were approved by Dr. Coyle, and which were performed by Dr. McMahon, a neurologist in Lander. Dr. Coyle reviewed Dr. McMahon's report on May 18, 1999.

[¶ 10] In late June 1999, Garnett submitted a standard form for additional health services. He was seen on June 30, 1999, by the nursing staff, who scheduled an appointment for Garnett with Dr. Coyle on July 14, 1999. Dr. Coyle examined Garnett on the latter date. Believing that Garnett's symptoms might be caused by something other than CTS, Dr. Coyle recommended cervical stretching exercises for six to eight weeks.[2]

[¶ 11] The nursing staff again saw Garnett on July 20, 1999, and August 8, 1999. For purposes of summary judgment review, we accept Garnett's assertions, as did the district court, that Dr. Coyle refused to see him for a "period of time" during this interval.[3] As can be seen from the list of exhibits Garnett submitted in opposition to summary judgment, he filed numerous informal and formal grievances during this period complaining of the delay since 1996 and his current inability to see Dr. Coyle. On August 10, 1999, Dr. Coyle again reviewed Garnett's records, and on August 17, 1999, Dr. Coyle referred Garnett to Dr. Schulze, this time for a surgical consultation. On August 23, 1999, Dr. Schulze recommended CTS surgery for Garnett's left wrist. The next day, Dr. Coyle ordered the surgery. The surgery was performed successfully on September 7, 1999.[4]

[¶ 12] Garnett's grievances did not end with the surgery. For purposes of his summary judgment motion, we will assume as true Garnett's additional complaints that Dr. Coyle changed the surgeon's pain medication recommendation from Percocet to Darvocet, that Garnett did not receive the antibiotics prescribed by the surgeon, that Garnett was not given the incentive spirometer he was supposed to use after surgery, and that he did not receive the throat lozenges he requested for pain resulting from the surgical breathing tube.

[¶ 13] CTS generally is a one-day procedure and patients do not typically receive post-hospital professional care. WSP's infirmary policy, however, required Garnett to stay in the infirmary for one day after surgery. Because his infirmary room was unclean, Garnett objected to being placed there. When informed of the situation, Dr. Coyle responded that he did not "have time for this," and did nothing about the room's condition. Garnett then told Dr. Coyle he "would be sorry" for making him stay there, adding "if you leave me in this filthy room, I'm taking your stupid ass to court."

[¶ 14] Garnett was seen by an RN and Dr. Coyle the day after his surgery. He had normal left hand sensations and movement, and he made no complaints of nausea, vomiting or other medication side effects. The following day, September 9, 1999, he was seen by Dr. Schulze, who "reordered" antibiotics, use of the incentive spirometer and pain medication. For purposes of the summary judgment motion, the district court assumed as true Garnett's statement that by September 10, 1999, he was complaining that the pain medication was making him ill. The medical records show no such complaint until nearly midnight on September 11, 1999. When informed the next morning of Garnett's complaints, Dr. Coyle changed Garnett's pain medication to Tylenol or Advil.

[¶ 15] Beginning on September 15, 1999, Garnett's care was handled by a physician's assistant, Jeff Deiss, P.A. (Deiss). Deiss removed the sutures from Garnett's incisions, noting no signs of infection, with good healing, sensation, color and movement. Deiss saw Garnett again on September 17, 1999, and September 20, 1999. Garnett's final follow-up appointment with Dr. Schulze revealed normal left hand function, reduced pain and "marked improvement" of the symptoms that necessitated the surgery.

**2.** Specifically, Dr. Coyle reasoned that the absence of wrist-related neurological deficits indicated Garnett may have been suffering from cervical radiculopathy rather than CTS.

**3.** All "facts" set forth herein are stated in the light most favorable to Garnett.

**4.** In a letter and a memorandum, both dated September 8, 1999, Department of Corrections Director Judith Uphoff and Health Services Administrator Jim Davis notified Garnett that the delays described in his grievances were a "scenario * * * unacceptable to the Department of Corrections," but the situation would be considered resolved as a result of the surgery finally having been performed.

Garnett recovered fully from the surgery, with no complications.

## THE CIVIL RIGHTS CLAIMS

[¶ 16]   42 U.S.C. § 1983 (Cum.Supp.2001) provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

[¶ 17]   This statute creates a federal cause of action for damages to vindicate violations of federal law committed by persons acting "under color of state law." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir.1995). To establish a 42 U.S.C. § 1983 claim, a plaintiff must demonstrate (1) that he has been deprived of a right secured by the Constitution and laws of the United States; and (2) that the alleged deprivation was committed by a person acting under color of state law. *D.T. by M.T. v. Independent School Dist. No. 16 of Pawnee County, Okl.*, 894 F.2d 1176, 1186 (10th Cir.), *cert. denied*, 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990).[5]

[¶ 18]   Specifically,   Garnett claims that Dr. Coyle violated his right under the Eighth Amendment to be free from "cruel and unusual punishment." A prisoner's treatment and the conditions of imprisonment are subject to Eighth Amendment scrutiny. *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). In that regard, " 'deliberate indifference to serious medical needs of prisoners' violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling*, 509 U.S. at 32, 113 S.Ct. 2475 (*quoting Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d

251 (1976), *cert. denied*, 434 U.S. 974, 98 S.Ct. 530, 54 L.Ed.2d 465 (1977)).   It follows that a plaintiff must show both "deliberate indifference" and "serious medical needs." *Estelle*, 429 U.S. at 104, 106, 97 S.Ct. 285. The first test is subjective, the second objective.   *Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir.1993) (*quoting Miller v. Glanz*, 948 F.2d 1562, 1569 (10th Cir.1991)).

[¶ 19]   A showing of negligence, indeed even gross negligence, does not amount to a showing of "deliberate indifference." *Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).   The plaintiff must show that the defendant knew of a substantial risk of serious harm to the plaintiff and still refused medical assistance. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

"[The test for deliberate indifference] affords considerable latitude to prison medical authorities in the diagnosis and treatment of medical problems of inmate patients.   Courts will 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.' *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).   Implicit in this deference to prison medical authorities is the assumption that such an informed medical judgment has, in fact, been made.   When, however, prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional standard of *Estelle* has been violated."

*Gomm v. DeLand*, 729 F.Supp. 767, 779 (D.Utah 1990), *aff'd*, 931 F.2d 62, 1991 WL 59954 (10th Cir.1991) (*quoting Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir.1979)).

[¶ 20]   To state a *prima facie* case of "deliberate indifference" under the

---

5.  The district court considered Garnett's civil rights claims under 42 U.S.C. § 1983 despite the fact that Garnett did not even cite to the statute

in his complaint.   Because 42 U.S.C. § 1983 is the proper vehicle to assert such a cause of action, we will follow the district court's lead.

Eighth Amendment, a plaintiff must show inaction that is equivalent to intentional or criminally reckless misconduct. *Estelle,* 429 U.S. at 104, 106, 97 S.Ct. 285. A difference of opinion over medical treatment, or a refusal to provide requested treatment does not, without more, show "deliberate indifference." *Riddle v. Mondragon,* 83 F.3d 1197, 1202–04 (10th Cir.1996); *Handy,* 996 F.2d at 1067. Where some medical attention has been afforded, a dispute over the adequacy of the treatment sounds, at most, in state tort law, and is not of constitutional magnitude. *Gomm,* 729 F.Supp. at 780.

[¶ 21] In addition to "deliberate indifference," the plaintiff must also show that such indifference was directed to a "serious medical need." " 'Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." . . . ' " *Riddle,* 83 F.3d at 1204 (*quoting Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992)). "Serious medical needs" are those diagnosed by a physician as mandating treatment or those that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Riddle,* 83 F.3d at 1202 (*quoting Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981)).

[¶ 22] The totality of the evidence contained in the summary judgment materials in the instant case reveals that there are no genuine issues of material fact and that Dr. Coyle is entitled to judgment as a matter of law on the Eighth Amendment claim. The affidavits and medical records clearly show a successful course of treatment afforded to Garnett. At most, Garnett's materials show only some delay in having the surgery, coupled with relatively minor post-surgical treatment complications. Most of the delay between Garnett's visit with Dr. Coyle on July 14, 1999, and the surgery on September 7, 1999, was occasioned by the fact that Dr. Coyle wanted to pursue a less aggressive treatment plan until he was sure that CTS was the problem and that surgery was warranted. Garnett had been complaining of left arm and wrist pain for three years. Ironically, within five months of Dr. Coyle's appearance on the scene, surgery had been performed.

[¶ 23] Once a *prima facie* case of appropriate medical treatment was shown, the burden shifted to Garnett to establish both prongs of the Eighth Amendment test: "deliberate indifference" and "serious medical needs." Neither was shown. From the evidence, it may be inferred that Dr. Coyle did not always give his immediate and full attention to Garnett's complaints. But there is no evidence of the level of culpability required to sustain such a claim. Further, the record reveals that Garnett's treatment was at least as good as that available to non-inmates. His post-surgical attention, in particular, exceeded the norm in that it lasted longer and involved more pain medication than would usually follow CTS release. Dr. Coyle's less-than-enthusiastic responses to Garnett's demands do not rise to the level of "deliberate indifference" to Garnett's condition for Eighth Amendment purposes. And the expert opinions contained in Dr. Coyle's and Dr. Ruttle's affidavits make it clear that no "serious medical needs" of Garnett were ignored. In fact, the incentive spirometer was unnecessary, since Garnett was immediately ambulatory, the antibiotic was contra-indicated, since routine antibiotic administration can lead to its ineffectiveness, and Darvocet is preferred over Percocet because it is less addictive.

### MEDICAL MALPRACTICE

[¶ 24] There are four elements to a cause of action for medical malpractice, which elements largely track the elements of a cause of action for negligence:

1. The accepted standard of medical care or practice (duty).
2. That the physician's conduct departed from that standard (breach).
3. That the plaintiff was injured (damages).
4. That the physician's conduct caused the injuries (cause).

*Oakden v. Roland,* 988 P.2d 1057, 1059 (Wyo. 1999) (*quoting Harris v. Grizzle,* 625 P.2d

747, 751 (Wyo.1981)); *Apodaca v. Ommen,* 807 P.2d 939, 943 (Wyo.1991). In addition, Wyo. Stat. Ann. § 1–12–601 (LexisNexis 2001) provides, in part:

(a) In an action for injury alleging negligence by a health care provider the plaintiff shall have the burden of proving:

(i) If the defendant is certified by a national certificating board or association, that the defendant failed to act in accordance with the standard of care adhered to by that national board or association; or

(ii) If the defendant is not so certified, that the defendant failed to act in accordance with the standard of care adhered to by health care providers in good standing performing similar health care services.

The determination of the standard of care imposed upon a defendant in a medical malpractice case is a question of law for the judge rather than a question of fact for the jury. *Roybal v. Bell,* 778 P.2d 108, 111 (Wyo. 1989). Expert medical testimony is generally required to establish a physician's failure to meet the standard of care. *Oakden,* 988 P.2d at 1059 (*quoting Harris,* 625 P.2d at 752–53); *Sayer v. Williams,* 962 P.2d 165, 168 (Wyo.1998) (*quoting Harris,* 625 P.2d at 752–53).

[¶ 25] While the plaintiff in a medical malpractice action generally carries the burden of proof on these issues, a defendant doctor who has moved for summary judgment must first establish a *prima facie* case of non-negligence. In the instant case, Dr. Coyle produced his own expert opinion and the expert opinion of an orthopedic surgeon as to the standard of care in a case of this nature and as to Dr. Coyle's having met that standard of care. Garnett produced no expert medical testimony in response.[6] Instead, he attempted to rely on language in the contract between WSP and CMS, and upon standards promulgated by the NCCHC. In making that attempt, Garnett failed to establish sufficient foundation for these "standards," and he presented no expert testimony that the standards are in effect, or how they should be applied.

[¶ 26] Like his Eighth Amendment claim, Garnett's medical malpractice claim must fail. There are no genuine issues of material fact, and Dr. Coyle is entitled to judgment as a matter of law. Garnett did not establish the applicable standard of care or a breach of that standard by Dr. Coyle. On the other hand, in support of his motion, Dr. Coyle established through expert opinion testimony both the standard of care and the fact that he had not breached that standard.

[¶ 27] Affirmed.

---

**6.** Garnett argues that Dr. Coyle was negligent because he did not immediately agree with Dr. McMahon's CTS diagnosis. In that sense, the "Nerve Conduction Study" identified as his Exhibit No. 1 in his response to Dr. Coyle's motion for summary judgment, which is Dr. McMahon's report, might be considered expert evidence. But Garnett produces no evidence of any kind, expert or otherwise, to suggest that it was malpractice for Dr. Coyle to postpone the CTS surgery and to first attempt the more conservative approach of stretching exercises.